**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 25-1449**

———————

RANDLE JACKSON, individually and as the Personal Representative of the Estate of Dashaun Simmons,

Plaintiff - Appellant,

v.

GERALD BUSH; DONTAI PARKS; CHERYL YOUNGQUIST; MICHELLE MAPP; THOMAS ROBERTSON,

Defendants - Appellees.

———————

Appeal from the United States District Court for the District of South Carolina, at Aiken. Jacquelyn Denise Austin, District Judge.  (1:23−cv−04955−JDA)

———————

Argued:  March 19, 2026                           Decided:  July 9, 2026

———————

Before DIAZ, Chief Judge, and GREGORY and BENJAMIN, Circuit Judges.

———————

Affirmed by published opinion.  Chief Judge Diaz wrote the majority opinion, in which Judge Benjamin joined.  Judge Gregory wrote a separate opinion concurring in part and dissenting in part.

———————

**ARGUED:**  Joshua Thomas Hawkins, HAWKINS & JEDZINIAK, LLC, Greenville, South Carolina, for Appellant.  Andrew Lindemann, LINDEMANN LAW FIRM, P.A., Columbia, South Carolina, for Appellees.  **ON BRIEF:**  Helena LeeAnn Jedziniak, HAWKINS & JEDZINIAK, LLC, Greenville, South Carolina, for Appellant.  William H. Davidson, II, Brian C. Mauldin, DAVIDSON & WREN, P.A., Columbia, South Carolina, for Appellee Gerald Bush.  Russell W. Harter, Jr., CHAPMAN HARTER, P.A., Greenville,

South Carolina, for Appellee Dontai Parks.  David A. DeMasters, RILEY POPE & LANEY, LLC, Columbia, South Carolina, for Appellees Cheryl Youngquist, Michelle Mapp, and Thomas Robertson.

––––––––––––

DIAZ, Chief Judge:

After a South Carolina Department of Corrections officer let inmates Jonathon Dominick and Dashaun Simmons out of their cells, Dominick retrieved a homemade weapon and brutally murdered Simmons. Simmons's estate sued several prison officials, alleging that they violated the Eighth Amendment by being deliberately indifferent to Simmons's safety and medical needs.

The district court granted summary judgment for the officers, and we now affirm. Simmons's death was a tragedy, but as we explain, the officers' conduct did not violate the Eighth Amendment.

I.

A.

Over the roughly six years that Simmons was incarcerated, other inmates attacked him at three different correctional facilities. He was stabbed twenty-three times in 2017 and was stabbed, bitten, and thrown down a flight of stairs in 2019.

After the 2019 attack, Simmons was transferred to McCormick Correctional Institution, a maximum-security prison. He lived in Dorm F-2 of the "A-Wing," which houses "inmates [who] were denied state-wide protective custody." Joint Appendix (J.A.) 2372. Inmates in the A-Wing don't "have contact with the rest of the inmate population." J.A. 2372.

Simmons was threatened at this facility, which he reported to some unidentified officers. And other inmates assaulted him there—by punching him and throwing hot water

3

on him—at least once before his death. At one point, Simmons asked medical staff if it was "necessary[] for someone to die before someone will take him seriously." J.A. 19.

                                                    B.

Then came the fateful day in November 2020. Officer Gerald Bush and trainee Michelle Mapp were on duty in Dorm F-2. Bush normally worked in a different dorm, so he wasn't "familiar with everybody" in Simmons's unit. J.A. 258.

Bush was responsible for "opening the top tier" of the dorm to let inmate workers out of their cells. J.A. 2372. When he let Simmons out, Simmons was "smiling and joking." J.A. 2372–73. Bush wasn't aware that other inmates had previously attacked and threatened Simmons.

An unidentified inmate worker told Bush that two other inmates, Jonathon Dominick and Darius Ransom, were barbers and could be let out to cut inmates' hair. Protocol called for Bush to consult a list of authorized workers or contact a supervisor to verify that they could be released. But Bush failed to do so. His typical practice was instead to "let barbers out if they asked to be let out." J.A. 668.

Bush walked over to Dominick and Ransom and asked them, "don't bullshit me, do y'all cut hair[?]" J.A. 670–71. They confirmed, "yeah, man, we cut hair." J.A. 671. Bush then opened their cells without further verification.

4

But Dominick lied about being a barber.[1]  According to an investigative report prepared by the South Carolina Department of Corrections, security footage shows that Dominick left his cell at 7:42 a.m. and returned shortly after.  He left his cell again at 7:48 a.m., this time holding an eight-inch ice pick made from a sink.  At 7:54 a.m., Dominick walked out of the security cameras' view, and there is no footage of the attack on Simmons.

An inmate witness reported that Dominick, Ransom, and Simmons crossed paths in the top tier and began arguing.  Ransom hit Simmons in the face, and Dominick then stabbed Simmons in the back.  Simmons managed to return to his cell, where the inmate witness found him "near[ly] passed out."  J.A. 572.  The other inmate picked Simmons up and began to look for help.

At that moment, Officer Cheryl Youngquist came to replace Bush on duty.  She saw an inmate carrying Simmons and running toward her.  The inmate called for her to open the dorm's entrance door.  Youngquist initially "thought they were playing" and didn't open the door.  J.A. 567.  But within two minutes, she realized that Simmons was bleeding heavily and called for medical help.

---

[1] Dominick worked as a "ward keeper assistant."  J.A. 148.  We don't have access to the authorized worker's list, but a Department official submitted a declaration that Dominick would have been permitted to leave his cell even as a ward keeper assistant.  At the same time, Youngquist testified that Bush "should not have let anybody out" that day because he was the only certified officer on duty.  J.A. 163.

5

Officer Dontai Parks was on a golf cart headed to his post. When he heard Youngquist's call, he drove to the F-2 dorm and allowed two inmates to put Simmons on the cart. He then drove Simmons to the yard gate and let the medical team take over.

Simmons was transported to a hospital, where he died from the stab wound.

C.

The representative of Simmons's estate, Randle Jackson, sued Bush, Mapp, Youngquist, Parks, and Thomas Robertson (the prison's associate warden) under 42 U.S.C. § 1983 and state law.[2]

Jackson alleged that the officers violated Simmons's Eighth Amendment rights. According to the complaint, the defendants knew that Simmons faced a substantial risk of serious harm from other inmates, yet they failed to protect him from the attack and to provide him with adequate medical care afterward.

The defendants asserted qualified immunity and moved for summary judgment. A magistrate judge issued a report recommending that the district court enter judgment for the officers. Jackson filed objections to that report. But the district court overruled all of Jackson's objections, adopted the magistrate judge's findings, and granted the defendants summary judgment.

This appeal followed.

---

[2] Jackson also sued the warden, John Palmer, but the district court granted Palmer summary judgment. Jackson doesn't appeal that decision.

6

II.

"We review district court decisions on motions for summary judgment and qualified immunity de novo." *Quinn v. Zerkle*, 111 F.4th 281, 290 (4th Cir. 2024). "[W]e must view the undisputed facts and all reasonable inferences drawn therefrom in the light most favorable to [Jackson] to determine whether there is a genuine dispute as to any material fact." *Id.*

III.

Since Jackson sued the officers in their individual capacities, they're protected by qualified immunity so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome this defense, Jackson must show "(1) that the government official[s] violated a statutory or constitutional right and (2) that right was clearly established at the time of the challenged conduct." *King v. Riley*, 76 F.4th 259, 265 (4th Cir. 2023). "[W]e may address the prongs in whatever order we choose." *Id.*

We focus our analysis on the first prong: whether the officers' conduct violated the Eighth Amendment.

A.

We start with Jackson's claim that Bush and Mapp were deliberately indifferent to Simmons's risk of being attacked. "The Eighth Amendment protects a convicted inmate from physical harm at the hands of fellow inmates resulting from the deliberate or callous

7

indifference of prison officials to specific known risks of such harm." *Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987) (citation modified).

Such a claim "requires two showings, one objective and one subjective." *Jehovah v. Clarke*, 798 F.3d 169, 181 (4th Cir. 2015). First, the plaintiff must establish "that the deprivation of a basic human need was objectively sufficiently serious." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (citation modified). Second, the plaintiff must demonstrate "that subjectively the officials acted with a sufficiently culpable state of mind." *Id.* (citation modified).

Satisfying the subjective prong requires "something more than mere negligence," but "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). The standard is close to recklessness: an official is liable when he "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

While it's a high bar, "prison officials may not simply bury their heads in the sand and thereby skirt liability." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). A plaintiff can show that an officer knew about a substantial risk through circumstantial evidence, including "the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

We consider a risk "obvious" when the "plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the

8

defendant-official being sued had been exposed to information concerning the risk." *Id.* at 842–43 (citation modified).

"[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Id.* at 843. "Nor may a prison official escape liability . . . by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the [injured inmate] was especially likely to be assaulted by the *specific* prisoner who eventually committed the assault." *Id.* (emphasis added).

Still, prison officials "remain[] free to rebut the deliberate indifference charge, even in the face of an obvious risk." *Makdessi*, 789 F.3d at 134. For example, they might show "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Farmer*, 511 U.S. at 844.

1.

At oral argument, Jackson conceded that his claim against Mapp might not rise to the level of deliberate indifference. We agree.

Since Mapp was only a trainee, not a certified officer, she couldn't handle keys or open any doors in the facility herself. She believed that Bush had verified that Dominick and Ransom could be released before he opened their cells. And Mapp also wasn't aware that Simmons was being threatened by other inmates at McCormick, that he'd been

9

attacked at other facilities, or that Dominick had a weapon. So there's no evidence that Mapp knew that Simmons faced a substantial risk of harm.

With Mapp in the rear-view mirror, we consider Bush's liability.

2.

Only the subjective prong of the deliberate indifference test is in dispute. Jackson argues that Bush disregarded an obvious risk to Simmons's safety by failing to properly verify that Dominick and Ransom were allowed out of their cells and by failing to closely supervise the inmates.

In hindsight, letting Dominick and Ransom out posed a significant threat. But we must consider how Bush perceived the risk at the time. *See Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303–04 (4th Cir. 2004). And the record doesn't show that he subjectively perceived a risk when he let the two inmates out.

Jackson contends that the risk was obvious because letting inmates out of their cells without proper verification violates the prison's protocol. But even "knowingly violating a prison policy does not amount to deliberate indifference." *King*, 76 F.4th at 267. Instead, "[t]o establish that a risk is 'obvious' . . . a plaintiff generally is required to show that the defendant 'had been exposed to information concerning the risk and thus must have known about it.'" *Danser v. Stansberry*, 772 F.3d 340, 348 (4th Cir. 2014) (quoting *Farmer*, 511 U.S. at 842). This Jackson failed to do.

Simmons allegedly told some unidentified officers at McCormick that he was being threatened. But there's no evidence that Bush knew this. According to Bush, Simmons never told him that he had "a problem with other inmates." J.A. 272. Without more, we

10

can't say that Bush must have known there was a risk in letting other inmates out around Simmons. *Cf. Cox v. Quinn*, 828 F.3d 227, 237 (4th Cir. 2016) (finding that officers knew of a risk where the plaintiff "repeatedly informed [them] that he feared for his safety").

Jackson argues that circumstantial evidence suggests that Bush knew about the risk. He emphasizes that McCormick is a maximum-security prison and that all inmates in Simmons's unit "had previously applied for and been denied protective custody." Appellant's Br. at 17. So, the argument goes, "Bush should have known that there was a reasonable possibility that Simmons had been attacked in the past and was therefore vulnerable to further violence." *Id.* at 18. Finally, Jackson claims that Bush should have appreciated the risk because when he was working at a different prison, he witnessed another incident "where inmates obtained weapons and attempted to attack other inmates." *Id.*

But it's not enough to show "that an official *should* have known of a risk." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). Bush testified that no one ever told him about the prior attacks inflicted on Simmons. And Bush wasn't "required to check the prison databases in which that information was contained" before letting inmates out of their cells. *Danser*, 772 F.3d at 348. Nor is there evidence that Bush "actually knew Dominick was carrying a weapon on the morning of the assault." J.A. 2418.

It's true that Simmons and Dominick both lived in the restricted A-wing unit. Yet, that doesn't mean that Bush perceived a risk in letting them out at the same time. In *Danser*, we explained that "[t]he mere fact that [two inmates] each had separation orders

11

with respect to other inmates does not show that [the officer] would have appreciated the risk posed by putting [those two inmates] in the same recreation cage." 772 F.3d at 348.

And while A-wing inmates couldn't mingle with the general population, Jackson hasn't shown that they couldn't do so within their own unit—indeed, the prison's practice of letting inmate workers out of their cells shows that some interaction in the dorm was expected. *Cf. Case v. Beasley*, 167 F.4th 651, 656 (4th Cir. 2026) (Eighth Amendment claim survived summary judgment because the officers knew that some inmates were to be separated from the general population yet still let the two groups interact). We found an Eighth Amendment violation in *Case* where the safety risk of violating the separation policy was "expressly noted by prison officials and communicated to the [defendants]." *Id.* at 660. But here, there isn't any evidence that the risk of letting an inmate worker out without proper verification was previously communicated to Bush.[3] So we can't say that the risk "was so obvious as to justify an inference of actual knowledge." *Parrish*, 372 F.3d at 305.

Finally, the other incident of inmate violence that Bush witnessed occurred at a separate facility and involved different inmates. And we don't know how the inmates at that other facility orchestrated their attack and, specifically, whether they too lied to Bush

---

[3] Our colleague would have us infer that Bush knew about the risk because he relied on inmates to verify Dominick's and Ransom's jobs despite knowing that inmates aren't always honest. Dissent at 24–25. But Bush's statements don't suggest that he subjectively believed his actions created an unreasonable safety risk. Tragically, we now know he was wrong. But hindsight has no role in deciding whether Bush was deliberately indifferent to the risk of harm.

about their job status to be released.  Without that context, the anecdote doesn't show that Bush appreciated the risk in Simmons's case.

Bush's lax verification standards are troubling.  So is the fact that Dominick walked around the dorm with a weapon for over six minutes.  But the deliberate indifference standard is a high one, and Jackson didn't establish that Bush acted with the requisite state of mind.[4]

B.

We turn next to Jackson's claim that Youngquist and Parks were deliberately indifferent to Simmons's medical needs after he was stabbed.  Prison officials may violate the Eighth Amendment when they "fail[] to provide adequate medical care to an inmate." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).  Again, such a claim involves an objective and subjective component.  *Id.*

---

[4] We would be satisfied to end our analysis here.  Our colleague though tackles the second step of qualified immunity, but here too he gets it wrong.  The dissent says that "'exacerbat[ing] a known and substantial risk that the plaintiff would be attacked by other incarcerated individuals'" violates clearly established law.  Dissent at 28 (quoting *Case*, 167 F.4th at 663).  But *Case* isn't on all fours: we said there that the risk was "known" because the officers were "repeatedly admonished" about the safety risk associated with violating prison policy.  167 F.4th at 662; *see also Cox*, 828 F.3d at 239 (affirming denial of qualified immunity where officers were "repeatedly informed" of threats to an inmate).  Bush had no such warning.

Without that link, Jackson needs precedent establishing a constitutional right to have an officer properly verify inmate workers before releasing them from their cells.  *See King*, 76 F.4th at 266 (defining the right at issue as the inmate's "right to have . . . a correctional officer look into the cell window while conducting a security check").  Jackson hasn't pointed to such a case, nor have we found one.

13

The plaintiff must first establish that the inmate had an objectively "serious medical need[]." *Id.* (citation modified). He must then show that the prison official subjectively "[knew] of and disregard[ed] the risk posed by the serious medical needs of the inmate." *Id.* (citation modified).

The official's actions must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Hixson v. Moran*, 1 F.4th 297, 303 (4th Cir. 2021) (citation modified). "[A] significant delay in the treatment of a serious medical condition may" support an Eighth Amendment violation if the delay caused "some substantial harm to the patient." *Webb v. Hamidullah*, 281 F. App'x 159, 166 (4th Cir. 2008).

### 1.

At oral argument, Jackson conceded that he may not have a viable claim against Parks. We agree that Parks, who drove Simmons to first responders on his golf cart, wasn't deliberately indifferent to Simmons's medical needs.

There's no evidence that Parks knew that driving Simmons directly to the medical team posed any risk to his health. Nor is there evidence that transporting Simmons on the cart unduly delayed his treatment. Parks's actions were instead "good-faith efforts" to help Simmons. *Koon v. North Carolina*, 50 F.4th 398, 407 (4th Cir. 2022).

### 2.

As to Youngquist, once again, only the subjective prong is at issue. Jackson argues that Youngquist was deliberately indifferent to Simmons's medical needs because when

14

another inmate called for help after the attack, she initially "thought they were playing" and didn't open the dorm's entrance door immediately. J.A. 567.

The magistrate judge found that "nothing in the record showed that Youngquist's . . . actions were grossly incompetent" or otherwise rose to the level of deliberate indifference. J.A. 2412. The judge concluded that Youngquist instead "acted to assist Simmons immediately upon [her] realization of his serious medical need." J.A. 2386.

Jackson objected to these findings, but he didn't offer any argument or evidence as to why the magistrate judge was wrong. So the district court found his objections conclusory and overruled them.

The lack of specificity in Jackson's objections means that he has forfeited them on appeal. *See United States v. Midgette*, 478 F.3d 616, 622 (4th Cir. 2007) ("[T]o preserve for appeal an issue in a magistrate judge's report, a party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.").

And on the merits, the deliberate indifference claim still fails. Youngquist "must have actually known that [her] response was inadequate to address [Simmons's] needs." *Iko*, 535 F.3d at 241 (emphasis omitted). But there's no evidence that Youngquist knew that Simmons needed medical attention when she arrived at the dorm.

Another inmate called for her to open the door, but it doesn't appear that he told her why. And when Youngquist realized—just a few minutes later—that Simmons was hurt, she "responded reasonably to the risk" by immediately opening the door and calling for

15

medical help. *Farmer*, 511 U.S. at 844. So Youngquist didn't "significant[ly] delay" Simmons's care. *Webb*, 281 F. App'x at 166.

C.

Finally, Jackson brought a supervisory liability claim against Robertson, the associate warden. But at oral argument, he also conceded this claim. We agree with the district court that Jackson failed to show "that Robertson had actual or constructive knowledge that Bush was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to inmates." J.A. 2422.[5]

IV.

Since Jackson didn't establish an underlying constitutional violation, the officers are entitled to qualified immunity and summary judgment.

*AFFIRMED*

---

[5] Of course, we've found that Bush's actions didn't breach constitutional norms. For that reason alone, no supervisory liability could extend to Robertson. *See Doe v. Rosa*, 664 F. App'x 301, 304 (4th Cir. 2016) ("There can be no supervisory liability when there is no underlying violation of the Constitution.")

GREGORY, Circuit Judge, concurring in part and dissenting in part:

Three weeks before Dashaun Simmons's death, he asked prison staff if it was "necessary for someone to die before someone will take him seriously." J.A. 344 (cleaned up). And now, even after Simmons's death, his haunting question is left unanswered. Simmons is not here to flesh out the record before us, to tell us what happened and who was responsible. As we attempt to understand the events leading to his death, we must view the record in the light most favorable to the nonmovant. The majority instead fully credits the account of the moving party—Bush—and dismisses any inferences that may be made against him. I believe this is error, so I would reverse the district court's decision as to Bush.

I.

Dashaun Simmons was a prisoner in the South Carolina Department of Corrections ("SCDC") between 2014 and his death in November 2020. His time in SCDC tells a horrific and shameful story of individual and institutional failure. In June 2017, Simmons began to be threatened by other prisoners at the Broad River Correctional Institution in Columbia, South Carolina. He reported these threats to prison officers, but he was ignored. In July 2017, one prison officer opened several cell doors, which allowed other prisoners to assault Simmons. Simmons was stabbed twenty-three times, and his jaw was broken. J.A. 18.

After returning from the hospital, he was transferred to Perry Correctional Institution. But the threats continued, this time from other prisoners at Perry. He told prison officers about the threats and his fear of being killed, yet the officers did not move

17

Simmons. In April 2019, Simmons was again attacked: he was "stabbed twice in the neck, bitten multiple times on the face, and pushed down a flight of stairs." J.A. 19. Simmons was transferred to McCormick Correctional Institution following the attack, where he remained until the fatal encounter that spawned this litigation.

At McCormick, Simmons was housed in the "adjustment unit," Dorm F-2, which houses prisoners who requested and were denied protective custody by SCDC. J.A. 185–86. Superintendent Robertson could not explain why Simmons was denied protective custody and claimed no knowledge of Simmons's history, though Simmons's medical records indicate that Simmons repeatedly discussed his trauma history with prison employees. J.A. 212, J.A. 1754. In fact, prison employees kept detailed notes of Simmons's grueling experiences. Simmons cut himself once to "get out of the cell" because another prisoner had told him, "I'm going to beat the hell out of you and then fuck you afterwards." J.A. 1753. One prisoner threw hot water on Simmons, burning him, while another prisoner "intentionally punched" him in the stomach. J.A. 351–56, J.A. 1723. During a mental health session in October 2020, Simmons stated that he believed "nothing [was] being done about [his] situation. J.A. 1723. He asked prison staff if it was "necessary(6) [sic] for someone to die before someone will take him serious[ly]." J.A. 344.

A few weeks later, on November 3, 2020, Defendant Gerald Bush was assigned to the adjustment unit. Bush had worked the unit "several times in the past." J.A. 254. Bush was responsible for "open[ing] top tier," which he testified meant that he was to release the

18

prisoners who worked particular jobs in the prison, such as barbers. J.A. 254.[*] He was the only certified officer in the unit at the time. J.A. 624. Bush also testified that he always let the workers and barbers out of their cells if they asked to be let out, and he did not consult any list to determine if they were actually workers. J.A. 255, 270.

After Bush released Simmons, a prisoner told Bush that two prisoners in a different area of the adjustment unit—Jonathan Dominick and Darius Ransom—were barbers as well. J.A. 258, 264–65. Bush then asked another prisoner across the hall whom he "had a good rapport" with whether Dominick and Ransom were barbers, and that prisoner confirmed they were. J.A. 258, 265. After speaking to these three prisoners, Bush approached Ransom and Dominick and said, "y'all don't bullshit me, do y'all cut hair." J.A. 670–71. Dominick responded that they were barbers. J.A. 267. Bush recognized that he perhaps should not have trusted the prisoners—"they ain't going to really keep it a hundred with you, honest with you." J.A. 265. Bush nonetheless accepted Dominick's assertions that they were barbers and opened the door to Dominick and Ransom's cells. J.A. 266–67.

After releasing the prisoners, Bush was called to Dorm F-4. J.A. 260–61. Bush gave Youngquist the keys to the adjustment unit and left for F-4. *Id.* Bush recognized that Simmons likely would not have been stabbed had Bush remained in the building. J.A. 285.

Security footage shows that Dominick exited his cell, went back into his cell, and exited again "clutching a white object in his right hand." J.A. 561. Dominick and Ransom

---

[*] Other defendants dispute that Bush's role involved letting barbers out of their cells, as detailed further below.

then walked up the stairs to the fire escape on the top level, out of view of security cameras. Simmons was stabbed there soon after. Before Bush reached F-4, nearly an hour later, he saw two prisoners carrying Simmons. J.A. 261. Simmons was pronounced dead from the stab wound hours later. Dominick and Ransom were eventually charged with Simmons's murder. J.A. 1417–19.

## II.

We review the district court's grant of summary judgment de novo. *Aleman v. City of Charlotte*, 80 F.4th 264, 283 (4th Cir. 2023). We view "all the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmovant." *Case v. Beasley*, 167 F.4th 651, 659 (4th Cir. 2026). Doing so "usually means adopting . . . the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Prison officials have a duty "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (internal citations omitted). "Whether a prison official acted with 'deliberate indifference' is a question of fact that can be proven through direct or circumstantial evidence." *Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016). And relevant to that question is whether "a prison official's response to a known threat to [prisoner] safety" is "reasonable." *Id.* A prison official could, for example, be deliberately indifferent if he knows a prisoner "faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N. Carolina Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (citing *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)). Put simply, deliberate indifference is "the *intentional* taking of a risk that the

20

defendant knows *might cause harm* while *lacking any intent to cause such harm*." *Anderson v. Kingsley*, 877 F.3d 539, 545 (4th Cir. 2017) (emphasis in original).

A risk might be "so obvious that the factfinder could conclude that the [prison official] *did* know of it because he could not have failed to know of it." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (emphasis in original)). A prison official "may not escape liability if it is shown, for example, that he merely refused to verify 'underlying facts that he strongly suspected to be true,'" or that he "'declined to confirm inferences of risk that he strongly suspected to exist.'" *Brice*, 58 F.3d at 105 (quoting *Farmer*, 511 U.S. at 843 n. 8).

The majority disposes of any claim against Bush because Bush did not "subjectively perceive[] a risk when he let the two inmates out." Maj. Op at 10. We should not accept Bush's bare assertion against a record rife with contrary circumstantial evidence. Bush was well "aware of facts from which the inference could be drawn" and "drew the inference" that Dominick and Ransom could pose a substantial risk of serious harm if released. *Cox*, 828 F.3d at 236 (citing *Farmer*, 511 U.S. at 837).

Every defendant in this case testified that Bush failed to properly verify that Dominick and Ransom were barbers before he released them. Defendant Mapp testified that asking another prisoner whether a prisoner is a barber is not an acceptable method of verifying a prisoner's work status. J.A. 740. She noted that releasing a prisoner without checking if they are on the dorm worker list is "inappropriate" and a "violation of policy." J.A. 743. Defendant Parks agreed that officers must check a dorm worker list before unlocking cell doors. J.A. 66. Defendant Robertson, too, stated, per prison "practice," J.A.

21

193, Bush should have checked "with a supervisor" to determine if the prisoners could be released. J.A. 221. He reiterated Bush's own point that prisoners at McCormick are "of course" untruthful, hence the guardrails to ensure prison officers corroborate worker status through official channels. J.A. 221.

Youngquist likewise stated that prisoners are often untruthful about their work status, so Bush should have verified that Dominick was a barber by using his radio to check with a supervisor or by checking the list of dorm workers posted to the lieutenant's door. J.A. 161. In the morning, dorm workers who assist with feeding and cafeteria workers may be permitted into the dorm, but "nobody else should be out." J.A. 161. She further noted that Bush was alone, and "you're really not supposed to let nobody out when you're in the dorm by yourself"—"every officer knows" that. J.A. 161–62.

These rules are obvious. It hardly takes a model employee to recognize that in a maximum-security facility, a prisoner is not released from his cell simply because he asks to be released. At the summary judgment stage, despite Bush's claims of ignorance, we must side with the nonmovant—and the overwhelming tide of circumstantial evidence— to determine that Bush understood this most basic prison practice.

And when we accept that Bush understood this practice, we must also accept that he knew the risk inherent in its violation. We cannot "ignore the reality that prisons are places where violent criminals are detained, presenting risks of harm far greater than exist on the outside." *United States v. Gore*, 592 F.3d 489, 493 (4th Cir. 2010). As this Court has frequently recognized, prison violence is so commonplace a risk that it functions as a background assumption underlying the law of liability in prisons. *See King v. Riley*, 76

22

F.4th 259, 266 (4th Cir. 2023) (acknowledging that the "general risks that all inmates pose[] to one another" is not alone enough to render prison officials liable for resulting harm) (internal citations omitted). I have no trouble assuming Bush, an employee in a maximum-security prison, was aware of that risk of violence, as all his colleagues were. *See* J.A. 164 (Youngquist testifying that one reason officers should not arbitrarily open cell doors is for the "general safety" of both officers and prisoners).

The majority appears to agree that this risk of violence exists, and that McCormick's protocol endeavors to guard against that risk. Its qualm is instead that the policy against "letting an inmate worker out without proper verification" was never "previously communicated to Bush." Maj. Op. at 12. The majority has correctly identified that nothing in the record spells out the risks to Bush of letting prisoners roam about the unit in a maximum-security prison. For similar reasons, a pilot need not be reminded to keep his plane airborne. Warning Bush not to release prisoners from cells on request because of the potential for prison violence is self-evident. The testimony of all the other defendants only emphasizes the farce of Bush's claims that he perceived no risk allowing Dominick to wander the halls of the unit.

The majority also finds it persuasive that, based on an SCDC employee declaration, both Dominick and Ransom would have been permitted to leave their cells because of their assignments as Ward Keeper and Barber. Maj. Op. at 5. Even so, no facts in the record state that Dominick and Ransom could be released that morning. Had Bush checked the authorized dorm worker list, he would have known that. J.A. 161. The privileges afforded to workers—including barbers—allow them to leave their cells at scheduled times, not whenever they

23

please. *See* J.A. 161 (Youngquist testifying that only certain dorm workers may be released in the mornings). "Worker" is not a shibboleth in a maximum-security prison.

Nor must we accept Bush's assertion that he was unaware that the prisoners in the adjustment unit had applied for and been denied protective custody. Robertson testified that all prisoners in Simmons's unit had requested—and been denied—protective custody by SCDC. J.A. 185–86. For that reason, each prisoner's contact with other prisoners is heavily regulated. J.A. 219. Bush had worked the adjustment unit "several times in the past." J.A. 254. Dorm F-2 is also repeatedly referred to as the "adjustment unit" in notes by prison employees in Simmons's medical records. *See e.g.*, J.A. 1753.

Again, Bush attempts to escape liability behind a shield of ignorance. His defense hinges upon this Court accepting his mystifying assertions: that he did not know that all the prisoners under his care had requested protective custody, and he did not perceive any risk from releasing prisoners who claimed to be barbers at their request.

Perhaps at trial, that ignorance might have been borne out. But accepting Bush's claimed obliviousness is hardly "adopting . . . the plaintiff's version of the facts," as we must do at the summary judgment stage. *Scott*, 550 U.S. at 378. We need not bury our heads in the sand and accept Bush's assertions in a case where his actions resulted in the cruel death of a man who had screamed loud and long for protection.

Bush's own actions demonstrate that he knew there was risk in permitting unauthorized prisoners free rein about the prison. For one, Bush immediately asked another prisoner "across the hall" whether Dominick and Ransom were barbers after he was told of Dominick and Ransom's status. J.A. 266. He then warned Dominick and

24

Ransom not to "bullshit" him. J.A. 265. His attempts to verify Dominick and Ransom's worker status betray his knowledge of the harm inherent in accepting prisoners' insistence that they could be released. Bush himself conceded his decision to trust a prisoner's representation of their worker status was dubious—"they ain't going to really keep it a hundred with you, honest with you." J.A. 265. But rather than attempting to corroborate their status through *any* official channels, Bush relied only upon sources that he admitted were unlikely to be honest with him. J.A. 265. This is far from "hindsight"; Bush recognized in the moment that his actions flouted reason. Maj. Op. at 10.

Bush's liability also turns on an objective component: the Eighth Amendment "requires *reasonable* action." *Cox*, 828 F.3d at 237 (emphasis added). "[A] factfinder may conclude that the officer's response to a perceived risk was so patently inadequate as to justify an inference that the officer actually recognized that his response to the risk was inappropriate under the circumstances." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004). Bush's decision to ignore basic prison practice, release Dominick and Ransom, and subsequently fail to monitor them—enabling them to re-enter their cells and procure the weapon—would permit a jury to draw such an inference here.

Bush also need not have known that Simmons was vulnerable to these particular perpetrators. *See* Maj. Op. at 11. It is enough that Bush was aware that Dominick and Ransom should not have been released, and that their release could cause serious harm. A prison officer may not avoid liability simply because he was unaware that a prisoner was "especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Cox*, 828 F.3d at 236 (citing *Farmer*, 511 U.S. at 843). *See Case*, 167 F.4th at

25

660 (reversing district court's grant of summary judgment to prison officers because they "were subjectively aware of the significant risk of serious harm resulting from" permitting one group in the prison to "com[e] into contact with individuals incarcerated in the general population"). And Bush was well aware that attacks among prisoners are a feature of prison life—he had witnessed one himself. *See* J.A. 283.

Bush's decision to release Dominick and Ransom was illogical, especially in light of the unanimous condemnation from Bush's coworkers and fellow defendants. So, while I agree with the majority that a violation of prison protocol does not per se violate the Constitution, Maj. Op. at 10, it may be evidence of knowledge. *See Brooks v. Johnson*, 924 F.3d 104, 122 (4th Cir. 2019) (in the excessive force context, holding that "whether an officer has complied with or, alternatively, violated a relevant use-of-force policy, while not dispositive, is highly relevant to [the subjective intent prong of the] inquiry").

The majority's reliance on *Danser v. Stansberry*, 772 F.3d 340 (4th Cir. 2014) does not permit us to ignore the evidence stacked against Bush. There, we vacated the district court's denial of qualified immunity to a prison officer when a sex offender was attacked by a member of a prison gang while unsupervised in a recreation space, even though both prisoners had separation orders. *Id.* at 348. But we did not hold that the prison officer acted with the requisite culpability. We merely recognized the district court had failed to make any findings on that question. *Id.* Moreover, there was *no* evidence confirming the prison officer was aware of the prisoner's status as a sex offender: the only information about the offender's status existed in an isolated prison database that the official was not

26

required to consult. *Id.* at 343. We therefore concluded that the district court's denial of qualified immunity to the officer was inappropriate.

But we have never held that an official's claim of ignorance can overcome overwhelming circumstantial evidence. In fact, we have said the opposite: despite a prison official's claims, a risk "might be so obvious that the factfinder could conclude that the guard *did* know of it because he could not have failed to know of it." *Brice*, 58 F.3d at 105. The record here teems with evidence of Bush's scienter. We can infer that Bush knew the vulnerable status of prisoners in Dorm F-2, based on both the widespread understanding that F-2 was the "adjustment unit" and Bush's own experience working the dorm. And we can interpret from Bush's behavior that he knew the risk of letting unauthorized prisoners leave their cells.

Viewing the record in the light most favorable to the nonmovant, I cannot endorse the majority's conclusion that Bush did not know about the substantial risk he created. At the very least, I am skeptical that Bush is the one prison official in the country that did not know the risks of allowing any requesting prisoner to wander the unit of a maximum-security facility.

I believe, as a result, a dispute of fact remains as to whether Bush's actions violated the Eighth Amendment.

### III.

I would also hold that Bush's misconduct violated clearly established law. When facts remain in dispute at the summary judgment stage, we may grant qualified immunity to an officer if the facts "viewed in the light most favorable to" the nonmovant support the

27

claim that the officer did not violate clearly established law. *Barricks v. Wright*, 168 F.4th 210, 214–15 (4th Cir. 2026).

*Case* again supplies the relevant precedent. 167 F.4th at 663. In *Case*, we recognized that the Eighth Amendment right at issue was clearly established where "the actions of the correctional officers exacerbated a known and substantial risk that the plaintiff would be attacked by other incarcerated individuals." *Id*. Bush "exacerbated rather than abated a known and substantial risk of harm" in the adjustment unit when he "purposefully" opened the door to workers he knew could be misrepresenting their worker status. *Id.* That act directly culminated in Simmons's death. Thus, I believe it was error to grant Bush qualified immunity.

The majority distinguishes *Case* because the risk there was "known." Maj. Op. at 13 n.4. But for the same reasons I outline above, I am comfortable concluding that Bush was aware of the blatant risk his actions created. To accept otherwise is to assume Bush's remarkable unawareness, which the record does not require of us at this stage.

## IV.

Bush released Dominick and Ransom on the insistence of prisoners he recognized were unreliable. Simmons was killed by both men soon after. Yet the majority asks us to scrutinize Bush's conduct through rose-colored glasses, as though it would be ludicrous to assume that a professional correctional officer would know the risks involved in letting unauthorized prisoners roam a unit in a maximum-security prison. Because I cannot, in

28

good conscience, hold that we may absolve Bush of liability at this stage, I would vacate the district court's decision as to Bush.

Thus, I respectfully dissent.

29